**Keith A. MOORE, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**Walter McNARY, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Supreme Court of Kentucky.

July 3, 1978.

Rehearing Denied Sept. 12, 1978.

Jack Emory Farley, Public Defender, Erwin W. Lewis, Asst. Public Defender, Frankfort, for appellant Moore.

Jack Emory Farley, Public Defender, Rodney McDaniel, Asst. Public Defender, Frankfort, for appellant McNary.

Robert F. Stephens, Atty. Gen., Miles H. Franklin, James L. Dickinson, Asst. Attys. Gen., Frankfort, for appellee.

CLAYTON, Justice.

On March 29, 1977, Indianapolis, Indiana, residents Keith Moore and Walter McNary were tried and convicted for the armed robbery of a service station in Simpson

County, Kentucky. *See* 1966 Ky.Acts, Ch. 48, § 1 (repealed 1975). Both now appeal, asserting between them a total of six different grounds for reversal of their convictions. After considering the arguments of counsel on both sides of the controversy, and after reviewing the record on appeal, we are convinced that the convictions should stand.

Well into the late night hours of November 22, 1974, a bluish-green Dodge or Plymouth station wagon bearing two black men and a woman pulled into Carter's Sunoco just off I–65 in Simpson County. Except for attendants Howard Haddock and Jerry Britt, the station was deserted. Following the use by one of the men of the restroom, all three newcomers entered the station office, where one of the men trained a gun on Haddock and Britt and demanded that they hand over the station's money. When the cash register yielded only $75, the man with the gun told Haddock he knew there was more money and unless Haddock turned it over he would "blow the top of [Haddock's] head off." Haddock quickly admitted that the proceeds from the afternoon shift's sales, totaling over $300, were hidden in the coffee machine and unlocked it for the men. After taking Haddock's .22-caliber pistol and a 12-gauge shotgun, the men forced Haddock and Britt into a back room, ran out to their car, and sped away into the darkness.

The evidence connecting appellants with the robbery was basically as follows. First, three weeks after the robbery, Haddock's pistol was located in Lawrence, Indiana, in the possession of Moore, who moments before the gun was recovered had been riding in a bluish-green Plymouth station wagon. Secondly, both Haddock and Britt identified Moore and McNary in court as the culprits. When asked on direct examination if the persons who robbed the station were present in the courtroom, Haddock responded, "Well, yes, to my belief it is the defend-

ants," and later identified Moore as the man who had wielded the gun and who had taken his pistol from him. Britt similarly stated he was "pretty sure" that Moore and McNary were the robbers and also identified Moore as the gunman, noting on cross-examination that although it had been some three years since the robbery, "it is pretty obvious that a man gets a gun drawed on him can pretty well identify who done it if it was ten years from now." Both Moore and McNary concede that this evidence is sufficient to support their convictions, but argue that the trial court committed a number of errors which require that the convictions be reversed.

Both Moore's and McNary's first contention concerns the failure by the court below to conduct an evidentiary hearing to determine whether Haddock's in-court identifications were tainted by an unnecessarily suggestive pretrial identification procedure.[1] A few days after Moore and McNary were taken into custody by Indiana authorities, a "mug shot" of each man, each clearly marked with a police identification number on the front, was received by the Kentucky State Police and shown to Haddock. At first, Haddock told police he was not entirely sure that Moore and McNary were the robbers, that he could not really tell just by looking at photographs; after viewing the pictures for some 20 minutes, however, Haddock concluded, "Well, it looks like them." Prior to trial, defense counsel moved to suppress all identification evidence on the ground that the procedure of showing Haddock a single mug shot of each appellant unaccompanied by any other photographs was so impermissibly suggestive as to deprive both the pretrial identifications and any in-court identifications which might be made at trial of all reliability, and asked the trial court to conduct a hearing on the matter. Although agreeing that any testimony relating to the pretrial identifica-

---

1. Despite Moore's additional contention that Britt's in-court identifications were similarly influenced by a suggestive pretrial lineup, it does not appear from the record that a hearing was ever requested to determine the admissibility of

Britt's testimony, *see Lewis v. Commonwealth,* Ky., 463 S.W.2d 137 (1970), nor is there anything in the record which indicates that the lineup was in any way suggestive.

tions should be prohibited, the court refused to hold a hearing with respect to possible in-court identifications, stating that any taint which existed could be adequately exposed during cross-examination.

Moore and McNary assert that the trial court's refusal to hold a suppression hearing constitutes error, and we agree. Wherever there is a substantial basis for the claim that a forthcoming in-court identification is tainted by an improper pretrial identification procedure, a suppression hearing, if affirmatively requested, should be conducted. *Cf. Francis v. Commonwealth,* Ky., 468 S.W.2d 287 (1971). This does not mean, however, that the judgments of conviction entered against Moore and McNary must automatically be vacated and their cases remanded for a hearing. *Harris v. Commonwealth,* Ky., 556 S.W.2d 669 (1977); *Ray v. Commonwealth,* Ky., 550 S.W.2d 482 (1977). For if it is clear from the record on appeal either that (1) the complained of pretrial identification procedure was not at all suggestive, *cf. Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); (2) the pretrial procedure, while suggestive, was necessarily so, *see Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); (3) under the "'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive," *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); or (4) the admission of the identification testimony, even if it be assumed to be unreliable, was harmless error, *see Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), remanding for a hearing would serve no purpose.

In the case at hand, there is no question that the display to Haddock, while Moore and McNary were in custody of Indiana authorities, of a single mug shot of each man unaccompanied by any other pictures, was unnecessarily suggestive. *See Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *United States*

*v. Washington,* 292 F.Supp. 284 (D.D.C. 1968). The crucial question, therefore, is whether Haddock's in-court identification of appellants was reliable despite this suggestiveness, i. e., whether he likely would have been able to identify Moore and McNary even if a proper photographic identification procedure had been utilized. As mentioned previously, resolution of this question must be made in light of the "totality of the circumstances" surrounding Haddock's identification, and depends upon a number of factors including his opportunity to view the robbers at the time of the crime, his degree of attention, the accuracy of his prior description of the robbers, the length of time between the robbery and the pretrial photographic showup, and the level of certainty he demonstrated at the showup. *Neil,* 409 U.S. at 199–200, 93 S.Ct. 375. Against these factors must be weighed the corrupting effect of the suggestive identification procedure itself. *Manson,* 432 U.S. at 114, 97 S.Ct. 2243.

Applying this analysis to the facts of this case, we are satisfied that Haddock's identification of Moore and McNary was not induced by the suggestive photo display. As described by both Britt and Haddock, the robbery must have taken at least several seconds, and perhaps minutes, to transpire: the robbers entered the office, returned to their car, reentered the office, emptied the cash register, emptied the coffee machine and kicked in a door to a back room before leaving. During this time, the robbers wore no masks and stood within feet of Haddock. Haddock was no casual or passing observer, but paid close attention to his assailants, as witnessed by his ability to distinguish between the two in identifying Moore as the gunman. Although Haddock's description of the robbers, which included their race, heights and weights, was not as detailed as it might ideally have been, it was reasonably accurate so far as it went.[2] And while the level of certainty

---

2. Although McNary makes much of the fact that Haddock described both robbers as being six feet tall, when McNary is actually only five feet eight inches in height, inasmuch as it ap-

pears that Haddock was only asked to give an approximate description, we think McNary places too much emphasis on this discrepancy. *See Coleman,* 399 U.S. at 4–5, 90 S.Ct. 1999.

displayed by Haddock at the photographic showup leaves something to be desired, unlike the situation in *Foster, supra,* the only case to date in which the United States Supreme Court has found identification procedures to be violative of due process, that level of certainty did not dramatically improve at the subsequent in-court identification. Under these circumstances we are convinced that Haddock's identification of Moore and McNary was reliable and see no need to remand for a hearing.

The second argument, urged by Moore alone, concerns the testimony of Lawrence, Indiana, police officer Samuel Beckenbaugh, who testified on direct examination that at the time Haddock's pistol was recovered, he was in foot pursuit of Moore: "Mr. Moore ran from me and jumped the fence and across the ditch and threw the gun down into a ditch; after the canine searched the area for Mr. Moore I retrieved it." Moore does not argue that this testimony should have been excluded from evidence; indeed, he concedes that since it linked him with the gun it was admissible to establish his identity as a participant in the robbery of Carter's Sunoco. *See Jones v. Commonwealth,* Ky., 554 S.W.2d 363 (1977). Rather, he asserts that because the testimony also contained an implication that he was involved in criminal activity in Indiana as well as in Kentucky (Beckenbaugh was evidently chasing Moore in connection with the robbery of an Indianapolis grocery), once the testimony was admitted he should have been allowed to counter this implication during cross-examination by exposing the fact that he was later acquitted of the charges against him. The quick answer to this argument is simply that we do not agree Beckenbaugh's testimony contained evidence of other crimes. To the contrary, it appears to us that after hearing this testimony, the jurors more likely than not thought Beckenbaugh was attempting to apprehend Moore for the gas station robbery in Kentucky. The information referred to above relating to the Indiana robbery was only disclosed during a conference at the bench, outside the hearing of the jury. If it was injected into the case at all, it was done so via the insinuations of defense counsel during cross-examination and not by Beckenbaugh's testimony on direct examination.

As is sometimes the difficulty with "quick" answers, however, in solving one problem we have created another. For despite the fact that Beckenbaugh's testimony did not contain evidence of another crime, it did contain evidence of flight from law enforcement officials—evidence which, if the jurors viewed Beckenbaugh's testimony as we have said they did, may have been incorrectly interpreted as an admission by Moore that he was guilty of the robbery of Carter's Sunoco. *Cf. Hamblin v. Commonwealth,* Ky., 500 S.W.2d 73 (1973). In light of this possibility, it probably would have been better for the trial court to allow Moore to correct this misconception; though this could only have been accomplished by Moore himself raising the spectre of the Indiana crime, it should have been up to Moore to decide whether to risk this course of action, not the trial court. Since such a tactic might have created as much prejudice as it would have dispelled, however, any error which may have resulted from the court's prohibition on evidence relating to the Indiana robbery was harmless.

Moore and McNary next contend that the court below erred by refusing to order the production under RCr 7.26 of a "case report" which Beckenbaugh had written following the recovery of Haddock's pistol in Indiana, but which he inadvertently forgot to bring with him to trial. Had this report been shown to have been in the possession of either the prosecution or Kentucky police, which must be considered an arm of the prosecution for this purpose, it would, of course, have fallen within the proscriptions of RCr 7.26 and the refusal of the court to compel its production would have constituted error. *Cf. Gaston v. Commonwealth,* Ky., 533 S.W.2d 533 (1976);

*Maynard v. Commonwealth,* Ky., 497 S.W.2d 567 (1973). Because the report was in the possession of Indiana authorities, however, the rule does not apply and we cannot say that the trial court acted improperly. If appellants desired to have the report for use in cross-examining Beckenbaugh, they should have asked for a continuance and procured the document themselves.

Moore's and McNary's remaining assignments of error were not preserved for appellate review. RCr 9.54; 9.22.

The judgments are affirmed.

All concur, except REED, J., who concurs in the result.