# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: AUGUST 21, 2008
NOT TO BE PUBLISHED

# Supreme Court of Kentucky FINAL

## 2005-SC-000942-MR

DATE 9-11-08 EnReCraumPC.

COREY MARTINDALE                                               APPELLANT

V.
ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE STEPHEN K. MERSHON, JUDGE
NO. 04-CR-0001874 AND 05-CR-000584

COMMONWEALTH OF KENTUCKY                                        APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

This is a matter of right appeal from a judgment of the Jefferson Circuit Court convicting Appellant Corey Martindale of first-degree robbery, tampering with physical evidence, and being a persistent felony offender in the first degree (PFO I). We reject Appellant's arguments, and affirm the judgment of the circuit court.

The facts in this case are largely uncontested because Appellant presented no witnesses during the guilt phase of the trial. On the evening of May 21, 2004, Todd Wells, Tyler Burden, Tony Avery, and Glenn Meredith decided to play basketball near Sixth Street and St. Catherine Street in Louisville. At the time, Wells was a student at the University of Louisville, and he lived approximately two minutes from the basketball court. Wells, Burden, and Meredith drove to the court together, while Avery drove separately.

Because a group of children were playing on half of the court, the four men decided to play on the other half. Wells set his car keys and cell phone underneath the basketball goal, and the men began their game. Because it was late May, the sun was still up at the time.

After approximately one and a half minutes, an older male stranger, who the men later identified as Appellant Corey Martindale, approached the court. Soon after Wells told Appellant that he could play the next game, Appellant picked up Wells' cell phone from under the basketball goal. Meredith informed Wells that Appellant had his cell phone, and Wells demanded that Appellant return the phone. Appellant said that he would give the phone back in exchange for some money. Wells told Appellant that he did not have any money. At that point, Appellant pulled out a semi-automatic pistol, cocked it, pointed it at Wells' head, and asked, "Are you sure you don't have any money?"

The other three men quickly scattered. Wells did not move, but put his hands in the air. Wells told Appellant that he did not have any money, but that Appellant could keep the cell phone. Wells asked Appellant "not to do this." After Wells continued to insist that he did not have any money, Appellant threw the cell phone to Wells and put away the pistol.

The four men then walked quickly to their cars, with Appellant following and continuing to ask for money. Appellant told the men that "You should expect this if you come into this neighborhood." Appellant also told the men that "everything is cool," and that they should not "call the cops." Appellant attempted to shake Wells' hand, but Wells refused. While the men walked, Burden noticed a tattoo on Appellant's right forearm. Eventually, Wells, Burden, and Meredith arrived at their car. As Avery walked

2

to his car, Appellant continued to talk to him and ask him for money. Avery eventually entered his vehicle, and all four men drove away.

Tyler Burden's father, Buddy Burden, worked as a tow truck driver for the Louisville Police Department. As the men drove back to Wells' apartment, Tyler called his father and told him what had happened. Buddy Burden immediately reported the robbery on his police radio. As he spoke to his father, Tyler described the man who had pulled the gun as African American, short with a small build, and wearing khaki shorts with a blue patterned shirt. Buddy Burden relayed the description to police, and police officers quickly arrived on the scene.

While driving nearby, Officer Kristin Downs saw Appellant, who matched the description Tyler provided. Appellant was wearing khaki shorts and a white t-shirt, with a blue patterned shirt slung over his shoulder. Downs pulled her cruiser over to speak to Appellant, but he immediately began running. Downs gave chase through an alley and temporarily lost sight of Appellant. She radioed for backup, and Officer Ronald Martin eventually apprehended Appellant. When Officer Martin captured Appellant, he no longer had the blue patterned shirt. Officers patted down Appellant, and did not find a weapon; however, they found several .32 caliber bullets in Appellant's pocket. Upon retracing Appellant's route, they found a .32 caliber semi-automatic pistol wrapped in a blue patterned shirt. The weapon had one round in the chamber.

After police captured Appellant, Buddy Burden informed the four men and told them to return to the scene. They returned in a single vehicle. Officer Amy Tanner interviewed the men while they were all seated in the vehicle. The men, who saw Appellant handcuffed and sitting in a police cruiser, testified that they immediately recognized Appellant as the man who had pulled the gun.

Wells correctly described the weapon to Officer Tanner as being black with a wooden handle; Burden also described the weapon as being black. Burden also noted that the perpetrator had a tattoo on his arm; Appellant has a tattoo on his right forearm. At the conclusion of the interview, police brought Appellant around and asked the men to identify him. All four men agreed that Appellant was the perpetrator. All four men also noted that Appellant was no longer wearing the same shirt. Approximately fifteen minutes passed between the incident and the identification. As police took Appellant into custody, he asked, "How can it be a robbery? I didn't get anything."

A grand jury indicted Appellant for first-degree robbery, tampering with physical evidence, and being a felon in possession on of a handgun. When Appellant did not plead guilty, the Commonwealth obtained an additional indictment against Appellant for being a persistent felony offender (PFO) in the first degree. The trial court bifurcated the felon in possession of a handgun and PFO I charges. Eventually, the trial court severed the handgun charge, and it is not part of this appeal. A jury convicted Appellant on the robbery and tampering with physical evidence charges. During the penalty phase, the jury convicted Appellant of being a PFO in the first degree. The jury recommended, and the trial court imposed, a sentence of 35 years imprisonment. This appeal followed.

Appellant argues that the trial court (I) improperly admitted evidence of the victims' pretrial identification of Appellant, (II) erred in refusing to grant attempt and renunciation instructions, (III) should have granted a mistrial due to several errors related to the jury, and (IV) committed multiple errors during the penalty phase and PFO proceedings. Appellant also argues that (V) the cumulative effect of these errors requires reversal. We discuss these arguments below.

4

## I. PRETRIAL IDENTIFICATION PROCEDURE

Appellant argues that the trial court erred by failing to hold a hearing, pursuant to RCr 9.78,[1] regarding the admissibility of the witnesses' out-of-court identification of Appellant. In Moore v. Commonwealth,[2] this Court concluded that "whenever there is a substantial basis for the claim that a forthcoming in-court identification is tainted by an improper pretrial identification procedure, a suppression hearing, if affirmatively requested, should be conducted." Here, the trial court erred in failing to hold a suppression hearing. When the witnesses returned, the police suggested to them that they had caught the perpetrator. Appellant was handcuffed, and the police asked the witnesses to identify Appellant through a "show-up" procedure, where police simply asked the witnesses if Appellant was the perpetrator. In addition, the police questioned all four witnesses at once, instead of individually. These procedures are very similar to those employed in Brown v. Commonwealth,[3] in which the court concluded that the defendant was entitled to a suppression hearing.

However, even when a defendant has been improperly denied a suppression hearing, we will not remand if, as a matter of law, the defendant's constitutional rights were not violated.[4] In evaluating the constitutionality of a pre-trial identification, we

---

[1] "If at any time before trial a defendant moves to suppress . . . evidence consisting of . . .witness identification, the trial court shall conduct an evidentiary hearing outside the presence of the jury and at the conclusion thereof shall enter into the record findings resolving the essential issues of fact raised by the motion or objection and necessary to support the ruling. If supported by substantial evidence the factual findings of the trial court shall be conclusive."

[2] 569 S.W.2d 150, 153 (Ky. 1978).

[3] 564 S.W. 2d 24, 28-29 (Ky.App. 1978) (determining that the defendant was entitled to a suppression hearing where the police told the witnesses "they thought they had the two guys," the suspects were handcuffed, and the witnesses identified the suspects through a "show-up" procedure while both witnesses were sitting together in a car).

[4] See Moore, 569 S.W.2d at 153 ("For if it is clear from the record on appeal either that (1) the complained of pretrial identification procedure was not at all suggestive; (2) the pretrial procedure, while suggestive, was necessarily so; (3) under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive; or (4) the admission of the identification testimony, even if it be assumed to be unreliable, was harmless error, remanding for a hearing would

apply a two-prong test from Neil v. Biggers.[5] We must "first determine whether the confrontation procedures employed by the police were 'suggestive.'"[6] If we conclude that the procedures were suggestive, then we must determine whether, under the totality of the circumstances, the identification is still reliable in light of the five factors enumerated in Biggers.[7] The five Biggers factors are (1) the opportunity to view, (2) the witness's degree of attention, (3) the accuracy of prior descriptions, (4) the level of certainty at confrontation, and (5) the time between the crime and the confrontation.[8]

A show-up procedure is undoubtedly suggestive, but does not violate a defendant's due process rights without something more.[9] Further, simultaneous viewings are best avoided, but this Court looks at simultaneous viewings on a case-by-case basis.[10] Because the procedures employed by the police were suggestive, we consider the five Biggers factors.

With regard to opportunity to view, all four witnesses had several minutes to observe Appellant. The witnesses noticed Appellant before he took Wells' cell phone, as he stood only a few feet away from the four men. They had the opportunity to view him after Appellant took the cell phone. And Wells certainly had an opportunity to view Appellant while Appellant pointed a gun at his head. In addition, Appellant continued to

---

serve no purpose.") (internal citations and quotation marks omitted); Brown, 564 S.W.2d at 29 ("The circumstances surrounding the identification of Brown and Hill by Franklin and Appleby required an evidentiary hearing out of the presence of the jury, but they were not, as a matter of law, so impermissibly suggestive as to deny Brown and Hill due process of law.").

[5] 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). See also Wilson v. Commonwealth, 695 S.W.2d 854 (Ky. 1985) (discussing and applying the Biggers test).

[6] Wilson, 695 S.W.2d at 857.

[7] Id.

[8] Savage v. Commonwealth, 920 S.W.2d 512, 513-14 (Ky. 1995).

[9] Brown, 564 S.W.2d at 29.

[10] King v. Commonwealth, 142 S.W.3d 645, 651 (Ky. 2004).

6

talk to the four men, and even followed Avery to his car. The witnesses had ample opportunity to view Appellant.

Regarding the second <u>Biggers</u> factor, all four had a high degree of attention. The four men did not merely witness a robbery; they were directly involved in the events. Wells has a gun pointed at his head, and the other three men were nearby observing. The four men testified to being terrified, and they likely paid a great deal of attention to Appellant as the events unfolded.

With regard to the accuracy of the witnesses' description prior to the show-up, Burden, in the presence of Wells and Meredith, accurately described Appellant to his father. Burden described the man who pulled the suspect as African American, small, and short, with khaki shorts and a light blue patterned shirt. When police apprehended Appellant, he was wearing khaki shorts. When Officer Downs first spotted Appellant, he had a shirt over his shoulder that matched the description given earlier. Appellant was also physically similar to the man Burden described. In addition, Burden accurately stated that Appellant had a tattoo on his right forearm. The witnesses' descriptions were extremely accurate.

With regard to the witnesses level of certainty, the four men stated with certainty that Appellant was the man who had pulled the gun on Wells. The men testified that, when they saw the Appellant, they were very certain that "that's the guy." The four witnesses had a high level of certainty.

Finally, with regard to the time between the crime and the identification, only ten to fifteen minutes passed between the incident and the witnesses' identifying Appellant. This extremely short time period is important in establishing the reliability of the witnesses' identification.

7

In addition to the Biggers factors, the witnesses' identification of Appellant is corroborated by other evidence. When police apprehended Appellant, he was wearing the khaki shorts the witnesses had described, and police found the blue patterned shirt nearby. Wells and Burden accurately described the weapon. Also, police found bullets in Appellant's pockets, and when apprehended, Appellant asked, "How can it be robbery? I didn't get anything." All of this evidence corroborates the witnesses' identification, and tends to make the identification more reliable.

Although the trial court erred in refusing to hold a suppression hearing, the witness' identification did not violate Appellant's constitutional rights. The procedure employed by the police was suggestive, but it was nevertheless reliable under the totality of the circumstances. Had the trial court held a hearing, the out-of-court identification would have been admissible as a matter of law. Therefore, there is no need to remand on this issue.

## II. ATTEMPT AND RENUNCIATION INSTRUCTIONS

Appellant argues that the trial court erred by refusing to give jury instructions on attempt and renunciation. Appellant points to Johnson v. Commonwealth,[11] in which the trial court convicted the defendant of first-degree attempted robbery. The defendant entered a store and raised a bumper jack in the air, demanding money.[12] The Court of Appeals considered whether the defendant was entitled to a second-degree attempt instruction.[13] The court concluded that no second-degree instruction needed to be given, because the defendant offered no testimony suggesting that "he was merely going to do property damage with the bumper jack in order to further the commission of

---

[11] 721 S.W.2d 721, 721 (Ky.App. 1986).
[12] Id.
[13] Id.

the robbery, or that he was going to put it down and threaten [the store owner] with his fists."[14] From this, Appellant argues that first-degree robbery requires an intent to harm the victim with the weapon. Appellant further argues that he was entitled to an attempt instruction because the evidence suggests that Appellant did not intend to harm Wells or the other men with the handgun.

The Commonwealth points to Kirkland v. Commonwealth,[15] which held that a defendant was not entitled to an attempted robbery instruction, because the robbery was complete when the defendant "entered the store with a gun in order to steal money from the victim." Kirkland suggests that the defendant does not have to have an intent to harm the victim with the weapon in order to be guilty of robbery. Johnson, on the other hand, suggests that an attempt instruction is appropriate when there is evidence that the defendant did not intend to harm the victim with the weapon.

Appellant suggests that "[c]urrently, tension exists between the holdings of Johnson and Kirkland." We disagree. KRS 515.020(1) (the first-degree robbery statute) reads as follows:

> (1) A person is guilty of robbery in the first degree when, in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he:
>
> (a) Causes physical injury to any person who is not a participant in the crime; or
>
> (b) Is armed with a deadly weapon; or

---

[14] Id. at 722.

[15] 53 S.W.3d 71, 76 (Ky. 2001).

(c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.

Johnson involved a prosecution under KRS 515.020(1)(c), which requires the use or threatened immediate use of a "dangerous instrument" (the bumper jack). However, the instant case and Kirkland both involve a prosecution under KRS 515.020(1)(b), which requires *only* that the defendant threaten the victim in order to obtain money, and be armed with a deadly weapon. Unlike the provision dealing with a dangerous instrument, there is no requirement that the defendant use or threaten the immediate use of the weapon. It is enough that the defendant is armed with a deadly weapon. [16]

As it stands, Appellant completed the robbery when he demanded money from Wells while armed with a deadly weapon. Robbery is "an offense against a person, and not an offense against property."[17] As such, robbery does not require a completed theft.[18] The robbery statute commentary illustrates this point:

> In another respect, however, [the robbery statute] makes an important change in the traditional robbery offense. This change results from the language, "in the course of committing theft," which is intended to expand the scope of robbery to permit a conviction even though the theft was incomplete . . . .
>
> With this change, robbery, as an offense against the person, is emphasized while robbery, as an offense against property, is de-emphasized.[19]

---

[16] KRS § 515.020 cmt. ("Under the first (subsection (1)(b)), robbery in the first degree is committed through mere possession of the deadly weapon. But, under the second (subsection (1)(c)), robbery in the first degree is committed only if the weapon, a "dangerous instrument," is actually used or threatened to be immediately used upon some person.").

[17] Stark v. Commonwealth, 828 S.W.2d 603, 607 (Ky. 1991), overruled on other grounds by Thomas v. Commonwealth, 931 S.W.2d 446 (Ky. 1996). See also Commonwealth v. Smith, 5 S.W.3d 126, 129 (Ky. 1999) ("Foremost, robbery is a crime against a person.").

[18] Wade v. Commonwealth, 724 S.W.2d 207, 208 (Ky. 1986).

[19] KRS § 515.020 cmt. This section of the commentary discusses KRS 515.030 (the second-degree robbery statute). However, the language of the two statutes is parallel, except that first-degree robbery requires an aggravating factor, such as being armed with a deadly weapon.

Even though Appellant did not succeed in completing a theft, he completed the crime of first-degree robbery. Therefore, we believe that cocking a pistol, pointing it at someone's head, and asking for money is sufficient to instruct the jury on first-degree robbery. Because the Commonwealth's uncontradicted evidence suggested that Appellant completed the robbery, Appellant was not entitled to an attempt instruction. Jury instructions must follow "the whole law of the case."[20] But here, Appellant presented no contradictory evidence to justify an attempt instruction.

Similarly, Appellant is not entitled to a renunciation instruction. Renunciation is a defense to attempt, but not to a completed crime. The renunciation statute clearly states that "[i]n any prosecution for *criminal attempt to commit a crime*, it is a defense that, under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, the defendant abandoned his effort to commit the crime . . . ."[21] In Tribbett v. Commonwealth,[22] we held that renunciation is a defense to attempted murder, but not to murder. Because Appellant was not entitled to an attempt instruction, he is also not entitled to a renunciation instruction. The trial court did not err in refusing to give these instructions.

## III. ISSUES RELATED TO THE JURY

Appellant alleges two errors related to the jury. Appellant argues that the trial court erred (A) in not declaring a mistrial after jurors saw a docket calendar listing abbreviations for charges against Appellant that were not before the jury, and (B) in not excusing a juror during the penalty phase after her best friend committed suicide.

A.     Jury Seeing Docket with Abbreviations for Additional Charges Against Appellant

---

[20] Grissom v. Commonwealth, 468 S.W.2d 263, 264 (Ky. 1971).

[21] KRS 506.020(1) (emphasis added).

[22] 561 S.W.2d 662, 663 (Ky. 1978).

Prior to trial, the trial court bifurcated the charges of possession of a handgun by a convicted felon, and being a PFO in the first degree.[23] During a recess, defense counsel observed at least one juror reading the court's docket calendar for the week. Appellant's case appeared on the calendar, along with a handwritten notation of the charges against him. In addition to "Robbery I," the calendar included the notations "PFO I" (referring to the persistent felony offender charge) and "POAG"[24] (referring to the possession of a handgun by a convicted felon charge). Only Appellant's case included handwritten information.

Appellant argued that this information was prejudicial, and moved for a mistrial. The trial judge stated that he was unwilling to declare a mistrial without first questioning the jury as to what they had seen. Defense counsel believed this would draw too much attention to the calendar, and maintained that a mistrial was the only remedy. The trial court refused to presume that the jury would understand the abbreviations, and denied Appellant's motion for a mistrial. The court immediately ordered the docket calendar removed.

Appellant argues that the trial court erred in refusing to grant a mistrial. Whether to grant a mistrial "is within the sound discretion of the trial court," and we review only for an abuse of discretion.[25] The trial court abuses its discretion when a decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[26]

---

[23] The trial court eventually severed the possession of a handgun by a convicted felon charge.

[24] The Commonwealth states in its brief that the notation was "poag." The trial court appeared to refer to the notation as "POGA." A copy of the docket calendar is not included in the record on appeal.

[25] Combs v. Commonwealth, 198 S.W.3d 574, 581 (Ky. 2006) (quoting Bray v. Commonwealth, 177 S.W.3d 741, 752 (Ky. 2005)).

[26] Commonwealth v. English, 993 S.W.2d 941, 945 (Ky. 1999).

In Romans v. Commonwealth,[27] we held that "counsel for the aggrieved party must exhaust all reasonably available means to have the error rectified . . . before he can be in a position to demand a mistrial." In the instant case, the trial court offered the entirely reasonable solution of questioning the jury. While Appellant argues that drawing attention to the docket calendar would have resulted in further prejudice, we believe that the trial court could have conducted very general questioning, which would not have revealed the problem with the calendar.

The trial judge told Appellant's attorneys that he would "do whatever you all want to do." The court was very open to suggestions on how to proceed in determining whether Appellant had been prejudiced. However, Appellant's counsel requested only the extreme remedy of a mistrial. Under Romans, Appellant had an obligation to first request a less extreme remedy before even possibly being entitled to a mistrial. Because Appellant did not ask that the jury be questioned, there is no evidence in the record suggesting that any juror saw or understood the calendar.

Without evidence that a juror understood the abbreviations on the calendar, there is insufficient evidence to justify a mistrial. We have held that:

> [a] mistrial is an extreme remedy and should be resorted to
> only when there appears in the record a manifest necessity
> for such an action or an urgent or real necessity. The error
> must be of such character and magnitude that a litigant will
> be denied a fair and impartial trial and the prejudicial effect
> can be removed in no other way ....[28]

In the instant case, we do not believe that the error was of great enough magnitude to automatically justify a mistrial. No one was clear on what exactly the jury had seen. An entire week's worth of cases appeared on the calendar. In addition, the charges not

---

[27] 547 S.W.2d 128, 131 (Ky. 1977).

[28] Combs, 198 S.W.3d at 581 (quoting Bray v. Commonwealth, 177 S.W.3d 741, 752 (Ky. 2005)).

before the jury were abbreviated. It seems unlikely that someone not experienced in criminal law would know what "PFO I" or "POAG" meant. We conclude that the error in allowing the jury to see the calendar was not "of such character and magnitude" as to deny Appellant a fair and impartial trial, particularly because defense counsel had an obligation to first ask for a less extreme remedy. The trial court did not abuse its discretion in refusing to grant a mistrial.

B.     Juror Not Excused After Her Best Friend's Suicide

During the penalty phase of the trial, after the jury had deliberated for approximately two hours, the jury took a lunch break. During the break, one of the jurors received a call, informing her that her best friend had committed suicide. The trial judge stated that he had spoken to the juror in his chambers, and that she was visibly upset. The judge explained to the juror that, if he dismissed her, "we'd have to start all over again." Reluctantly, the juror returned to deliberations.

The court stated that, if the juror was unable to complete deliberations, it would declare a mistrial on the penalty phase. Defense counsel objected to the juror's continuing service on the jury. The court then specifically asked defense counsel if he wanted the court to declare a mistrial, "which could be to your client's [Appellant's] disadvantage, because it would give the Commonwealth another shot to put in their proof a little bit better." Defense counsel did not request a mistrial, and stated, "I think I've said what I needed to say." The jury returned approximately thirty minutes later, and sentenced Appellant to 35 years imprisonment.

14

A party must make known to the court the action that it wishes the court to take.[29] We have also repeatedly held "that failure to move for a mistrial following an objection and an admonition from the court indicates that satisfactory relief was granted."[30] Here, defense counsel requested no specific relief, and merely objected generally to the juror's continued participation. The record suggests that defense counsel's failure to request a mistrial was a matter of trial strategy, because a mistrial "would give the Commonwealth another shot to put in their proof."

Defense counsel failed to request a mistrial, even when specifically asked by the trial court if he wanted to do so. The record suggests that the trial court may have been inclined to grant a mistrial, had it been requested. Because Appellant did not ask at trial for the relief now requested, we cannot grant it on appeal. The issue is therefore waived.

## IV. PERSISTENT FELONY OFFENDER (PFO) PROCEEDINGS

Appellant contends that multiple errors occurred during the PFO proceedings. Specifically, Appellant argues that the trial court erred by (A) allowing the Commonwealth to amend Appellant's indictment prior to the penalty phase, (B) failing to grant a continuance after the Commonwealth failed to disclose Appellant's prior convictions, and (C) failing to grant a directed verdict of acquittal on the PFO I charge.

---

[29] RCr 9.22. See also Howell v. Commonwealth, 163 S.W.3d 442, 447 (Ky. 2005); West v. Commonwealth, 780 S.W.2d 600, 602 (Ky. 1989) ("RCr 9.22 imposes upon a party the duty to make 'known to the court the action he desires the court to take or his objection to the action of the court . . . .' Failure to comply with this rule renders an error unpreserved.") (citing Bowers v. Commonwealth, 555 S.W.2d 241(Ky. 1977)).

[30] West, 780 S.W.2d at 602; See also Pace v. Commonwealth, 82 S.W.3d 894, 895 (Ky. 2002) ("The general rule is that a party must make a proper objection to the trial court and request a ruling on that objection, or the issue is waived.").

## A. Amendment of Indictment

Appellant argues that the trial court erred in allowing the Commonwealth to amend the PFO indictment. When a trial court allows the Commonwealth to amend a PFO indictment, we review only for an abuse of discretion.[31] The trial court abuses its discretion when a decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[32]

After the jury had reached a verdict on the robbery and tampering with physical evidence charges, but before the jury returned, the Commonwealth moved to amend Appellant's PFO indictment. The purpose of the amendment was to correct mistakes in the dates, number of counts, and sentences for Appellant's prior offenses.

As returned by the grand jury, the pertinent portions of Appellant's PFO indictment read as follows:

> (1) That on or about the 23rd day of September, 1992, in Jefferson County, Kentucky, the above named defendant, appeared in the Jefferson Circuit Court, a court of general criminal jurisdiction, pursuant to Indictment No. 93CR2073, charging him with Robbery in the First Degree, Wanton Endangerment in the First Degree and Failure to be in Possession of a Driver License, felonies in violation of the Kentucky Revised Statutes and that said court convicted and sentenced the defendant to twenty (20) years in the Kentucky Department of Corrections;
>
> AND
>
> (2) That on or about the 23rd day of August, 1991, in Jefferson County, Kentucky, the above named defendant, COREY MARTINDALE, appeared in the Jefferson Circuit Court, a court of general criminal jurisdiction, pursuant to Indictment No. 91CR0742, charging him with Robbery in the Second Degree, a felony in violation of the Kentucky Revised Statutes and that said court convicted and

---

[31] Riley v. Commonwealth, 120 S.W.3d 622, 631-32 (Ky. 2003).

[32] English, 993 S.W.2d at 945.

16

sentenced the defendant to six (6) years in the Kentucky Department of Corrections;

With regard to subsection (1) of the indictment, the Commonwealth sought to change (a) the date of the sentencing from September 23, 1992 to February 9, 1994; (b) the number of counts of Wanton Endangerment from one to four; and (c) the sentence from 20 years to 15 years. The Commonwealth also sought to delete the reference to failure to be in possession of a driver license. With regard to subsection (2) of the indictment, the Commonwealth sought to change the sentencing date from August 23, 2001 to August 26, 2001.

RCr 6.16 provides that:

> The court may permit an indictment, information, complaint or citation to be amended any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced. If justice requires, the court shall grant the defendant a continuance when such an amendment is permitted.

Appellant argued at trial that the amendment violated his substantial rights, and that he was entitled to a continuance. However, defense counsel admitted that it had known for some time that the original indictment was factually incorrect.

In <u>Henderson v. Commonwealth</u>,[33] we permitted the prosecutor to amend a PFO indictment to include six additional prior convictions. In so doing, we stated the following:

> It is obvious from the facts that the only "offense" charged in the fourth count of both the original and amended indictment is that of charging the Appellant of being a persistent felony offender in the first degree. The amendment to the indictment served only to list additional previous crimes which were used to amplify the proof supporting the offense charged.[34]

---

[33] 636 S.W.2d 648, 651 (Ky. 1982).

[34] <u>Id.</u>

17

Similarly, the Commonwealth's amendment in the instant case only served to clarify the exact dates and offenses. The indictment contained no additional or different charges. As in <u>Henderson</u>, in the instant case the Commonwealth sought only "to amplify the proof."

In addition, as the trial court pointed out, the changes to subsection (2) of the indictment were not technically an amendment. As originally written, the indictment stated that Appellant appeared in court "*on or about* the 23rd day of August, 1991."[35] The Commonwealth changed the date to August 26. This was not a substantive change. Likewise, changes in Appellant's exact prior convictions were more a matter of form than substance.[36] The substantive charge was being a persistent felony offender. This did not change when the Commonwealth amended the indictment.

We also do not believe that the amendment prejudiced Appellant's rights. Defense counsel admitted that they were aware that the original indictments were incorrect. Therefore, no prejudice or surprise resulted from the Commonwealth's amending the indictment to make it factually correct. Also, after the Commonwealth made its motion, defense counsel was given the opportunity to examine the files from Appellant's prior convictions during lunch.

Defense counsel was well aware that the indictments were not correct. In addition, the changes to the indictments were not substantive. Under these circumstances, there was no prejudice to the Appellant. The trial court did not abuse its discretion in refusing to grant a continuance, or in permitting the Commonwealth to amend the indictment.

---

[35] Emphasis added.

[36] See <u>Veach v. Commonwealth</u>, 572 S.W. 2d 417, 419 (Ky. 1978) (holding that a name change in an indictment is "a matter of form and not of substance," and did not prejudice the defendant).

B.    Alleged Discovery Violations

Appellant argues that the Commonwealth was obligated to provide him with copies of his prior convictions during discovery, and that the trial court erred by not granting a continuance when it learned that the Commonwealth had failed to provide Appellant with copies of the prior convictions. We review discovery violations under an abuse of discretion standard.[37]

Just prior to the jury returning a verdict in the guilt phase of the trial, the parties began to make preparations for the sentencing phase. The Commonwealth announced its intention to proceed with the charge of possession of a firearm by a convicted felon against Appellant. To that end, the Commonwealth intended to introduce into evidence Appellant's 1998 conviction in Oldham County for promoting contraband in the first degree. Appellant objected to the Oldham County conviction, as well as the use of Appellant's other prior convictions, because the Commonwealth did not provide defense counsel with copies.

As a remedy, the court suggested trying the possession of a firearm by a convicted felon charge in a separate trial. Appellant decided that he did in fact want this charge tried separately. After the jury's guilty verdict, the jury considered only Appellant's sentence and the PFO charge during the sentencing phase. The Commonwealth only introduced the Oldham County conviction as part of its truth in sentencing evidence.

Appellant did not challenge the validity of any of the convictions; however, he did argue that he was not the person named in the indictments. Several prior convictions listed the name "Roy Smith." The Commonwealth presented evidence supporting the

[37] Penman v. Commonwealth, 194 S.W.3d 237, 249 (Ky. 2006) (citing Beaty v. Commonwealth, 125 S.W.3d 196, 202 (Ky. 2003)).

assertion that "Roy Smith" is one of Appellant's aliases. However, Appellant's primary argument during the PFO phase was that he was not the person listed in the earlier convictions.

RCr 7.24 provides, in pertinent part:

> (2) On motion of a defendant the court may order the attorney for the Commonwealth to permit the defendant to inspect and copy or photograph books, papers, documents or tangible objects, or copies or portions thereof, that are in the possession, custody or control of the Commonwealth ....

> (9) If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or an order issued pursuant thereto, the court may direct such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as my be just under the circumstances.

When a defendant in a PFO proceeding wishes to challenge the validity of an underlying conviction, he "is entitled to move for inspection and copying of all documents which will be used to establish the previous conviction."[38] In the instant case, Appellant did not challenge the underlying validity of the convictions. Instead, he argued that he was not the same person. In addition, nothing in the record indicates that Appellant ever requested copies of the earlier convictions, nor did he move for inspection of those documents.

The fact that Appellant did not request copies, nor move for inspection, might not be determinative had Appellant not been put on notice of the earlier convictions. However, in the Commonwealth's response to the trial court's discovery order, the Commonwealth stated that it "intends to introduce certified copies of the defendant's prior criminal convictions during the sentencing portion of the trial."

---

[38] Commonwealth v. Gadd, 665 S.W.2d 915, 918 (Ky. 1984).

The discovery that the Commonwealth turned over to Appellant included a detailed list of previous charges against Appellant in Jefferson County. It also included a Criminal History Conviction Report, which listed four prior convictions, including the 1998 Oldham County conviction. Every conviction the Commonwealth used during the sentencing phase was listed in this discovery. In addition, the Commonwealth informed Appellant that all records to be used were available for his counsel's inspection.

Appellant points to an unpublished opinion, Outlaw v. Commonwealth,[39] for the proposition that "the Commonwealth has the obligation under RCr 7.24 to provide a defendant with copies of the prior convictions it intends to introduce against him at the penalty phase of trial." In Outlaw, the Kentucky Court of Appeals held that the Commonwealth is obligated to provide copies of prior criminal convictions that it plans to use if either (1) there is a written motion for discovery requesting the records, or (2) as happened in Outlaw, the Commonwealth agrees to provide discovery.[40] The opinion is not clear as to whether the Commonwealth agreed specifically to provide the criminal records. The Outlaw court also emphasized that, even when a discovery violation occurs, the trial court has many options available to it, pursuant to RCr 7.24(9), in order to correct the error.[41]

We believe that providing Appellant a list of his prior convictions was sufficient notice on the part of the Commonwealth, particularly because the Commonwealth made the records available for inspection. Had Appellant requested the records by written

---

[39] No. 2002-CA-000400-MR, 2003 WL 1893479 (Ky.App. 2003). Appellant cites this unpublished opinion pursuant to CR 76.28(4)(c) ("Opinions that are not to be published shall not be cited or used as binding precedent in any other case in any court of this state; however, unpublished Kentucky appellate decisions . . . may be cited for consideration by the court if there is no published opinion that would adequately address the issue before the court.").

[40] 2003 WL 1893479, at *3.

[41] Id.

21

motion, or had the Commonwealth specifically agreed to provide copies of the records, then the Commonwealth may have had a duty to provide copies. But as it stands, the Commonwealth's actions were sufficient. In addition, even if a discovery violation occurred, the trial court has great latitude in fashioning a remedy. We believe that severing the possession of a firearm by a convicted felon charge was a sufficient remedy. No reversible error occurred.

## C.    Directed Verdict

Appellant argues that the Commonwealth failed to prove that he was a persistent felony offender in the first degree. Therefore, Appellant argues, he was entitled to a directed verdict on the PFO charge. We expressed our standard of review for a directed verdict in Commonwealth v. Benham:[42]

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony. On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

During the sentencing phase, a paralegal for the Commonwealth and Michael Jefferson of the Louisville Office of Probation and Parole testified regarding Appellant's prior convictions and parole eligibility. Viewing this evidence in the light most favorable to the Commonwealth, and accepting it as true, we come to the following conclusions.

---

[42] 816 S.W.2d 186, 187 (Ky. 1991).

Appellant had multiple prior convictions. Most importantly for purposes of the PFO charge, on July 20, 1991, Appellant was convicted of robbery in the first degree (a felony), four counts of wanton endangerment in the first degree, and failure to be in possession of a driver license. He received a 15-year concurrent sentence.[43] According to Jefferson's testimony, first-degree robbery is a Class B felony. As such, a inmate must serve 85% of his sentence before being eligible for parole. Jefferson also discussed good time credit, meritorious good time credit, and educational credit, all of which reduce an imate's sentence. Jefferson also testified, however, that these credits do not affect parole eligibility, and that an inmate must still serve 85% of his sentence for a Class B felony.

For a person to be guilty of being a PFO in the first degree, the Commonwealth must prove that he:

> 1. Completed service of the sentence imposed on any of the previous felony convictions within five (5) years prior to the date of the commission of the felony for which he now stands convicted; or
>
> 2. Was on probation, parole, conditional discharge, conditional release, furlough, appeal bond, or any other form of legal release from any of the previous felony convictions at the time of commission of the felony for which he now stands convicted; or
>
> 3. Was discharged from probation, parole, conditional discharge, conditional release, or any other form of legal release on any of the previous felony convictions within five (5) years prior to the date of commission of the felony for which he now stands convicted; or

---

[43] On March 27, 1991, Appellant was convicted of robbery in the second degree (a felony), and received a 6-year sentence. On May 7, 1998, Appellant was convicted of promoting contraband in the first degree (a felony), and received a 1-year sentence. On December 17, 2002, and on August 15, 2003, Appellant was convicted of theft by unlawful taking under $300 (misdemeanors), and received a 365-day concurrent sentence.

4. Was in custody from the previous felony conviction at the time of commission of the felony for which he now stands convicted; or

5. Had escaped from custody while serving any of the previous felony convictions at the time of commission of the felony for which he now stands convicted.[44]

"A reasonable inference is sufficient" to support a conviction under the PFO statute.[45] The jury was therefore entitled to make reasonable inferences arising from the testimony, as do we in reviewing the trial court's denial of a directed verdict. Appellant received a 15-year prison sentence for first-degree robbery on July 20, 1991. A jury could therefore infer that he would complete his sentence on July 20, 2006. Because Appellant committed the present offense on May 21, 2004, the jury could infer that Appellant was on parole or some other form of conditional discharge at the time he committed the present offense. Appellant would therefore be a PFO in the first degree pursuant to KRS 532.080(3)(c)(2).[46]

Jefferson's testimony also suggested that good time credits do not affect parole eligibility, and that a person convicted of first-degree robbery must serve 85% of his sentence in order to be eligible for parole. Therefore, the jury was entitled to infer that Appellant could not have been paroled prior to April 20, 2004.[47] Even if the jury assumed that, due to good time credits, Appellant was completely released from custody, and no longer on parole, as of this date, Appellant still would have committed

---

[44] KRS 532.080(3)(c).

[45] Martin v. Commonwealth, 13 S.W.3d 232, 235 (Ky. 2000).

[46] "Was on probation, parole, conditional discharge, conditional release, furlough, appeal bond, or any other form of legal release from any of the previous felony convictions at the time of commission of the felony for which he now stands convicted . . . ."

[47] 85% of 15 years is 12 years and 9 months. April 20, 2004 is 12 years and 9 months after the date Appellant was convicted (July 20, 1991).

24

the present offense within 5 years of his release. Therefore, Appellant would be a PFO in the first degree pursuant to KRS 532.080(3)(c)(3).[48]

Appellant argues that inferences such as these "fail to take into consideration [Appellant's] credit for time served prior to trial, good time credits, and any other factors which would result in his release from the sentence by May 1999 (5 years from the date of the commission of the offense)." However, this would require the Commonwealth to prove a negative. We addressed a nearly identical argument in Shabazz v. Commonwealth.[49] In Shabazz, which also dealt with the denial of a directed verdict in a PFO proceeding, the Court acknowledged that the Commonwealth had failed to present "any evidence as to whether Appellant had been released from probation 'by virtue of executive clemency, reversal on appeal, release by way of habeas corpus, or by other means whereby persons serving felony sentences may gain relief.'"[50] But we concluded that the Commonwealth is not required to engage in "the almost impossible task of proving a negative."[51] We further stated that "the burden of proving such negatives is on the defendant."[52]

The Commonwealth is not required to prove that Appellant did not receive good time credit, or that he did not serve time in jail prior to his conviction. Appellant has the burden of proving that such a circumstance did in fact exist. At trial, Appellant presented no evidence suggesting that he had completed his sentence more than five years prior to the present offense. Under the evidence presented, it was not clearly

---

[48] "Was discharged from probation, parole, conditional discharge, conditional release, or any other form of legal release on any of the previous felony convictions within five (5) years prior to the date of commission of the felony for which he now stands convicted . . . ."

[49] 153 S.W.3d 806 (Ky. 2005).

[50] Id. at 814.

[51] Id.

[52] Id. (emphasis in original).

25

unreasonable for the jury to make inferences and find Appellant guilty of being a PFO in the first degree. The trial court did not err in denying Appellant's motion for a directed verdict.

## V. CUMULATIVE ERROR

Finally, Appellant argues that, taken together, the cumulative errors in his trial require reversal, even if none of the errors individually would be severe enough. Any error that occurred in Appellant's trial was harmless, particularly given the overwhelming evidence of Appellant's guilt.[53] In addition, these harmless errors are nowhere near as severe as the errors in cases cited by Appellant.[54] We conclude that there is no cumulative error requiring reversal.

For the foregoing reasons, the judgment of the Jefferson Circuit Court is hereby affirmed.

All sitting. All concur, except Venters, J., not sitting.

---

[53] See Emerson v. Commonwealth, 230 S.W.3d 563, 570 (Ky. 2007) (holding that an error is harmless when there is "no reasonable possibility that it affected the verdict").

[54] See, e.g. Funk v. Commonwealth, 842 S.W.2d 476, 483 (Ky. 1993); Sanborn v. Commonwealth, 754 S.W.2d 534, 542-49 (Ky. 1988).

COUNSEL FOR APPELLANT:

Euva D. May
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane
Suite 302
Frankfort, KY 40601


COUNSEL FOR APPELLEES:

Jack Conway
Attorney General

Bryan Darwin Morrow
Criminal Appellate Division
Office of the Attorney General
1024 Capital Center Drive
Frankfort, KY  40601