RENDERED: MARCH 26, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-000219-MR

CURTIS SNELL                      APPELLANT

ON APPEAL FROM KENTON CIRCUIT COURT
V.            HON. GREGORY M. BARTLETT, JUDGE
NO. 16-CR-00665

COMMONWEALTH OF KENTUCKY           APPELLEE

### MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Curtis Snell ("Snell"), was convicted by the Kenton Circuit Court of assault in the first-degree, and four counts of wanton endangerment in the first-degree. Snell was also found guilty of being a persistent felony offender in the first-degree. The jury recommended Snell serve 50 years for the assault charge and 10 years for each of the wanton endangerment charges, to run consecutively for a total of 90 years. Ultimately, the trial court reduced the sentence to the statutory maximum of 70 years. For the reasons set forth herein, we affirm the court below.

### A. BACKGROUND

Linsey Kidwell ("Kidwell") and her boyfriend Lamar Mills ("Mills") had arrived at Muggbees bar in Florence, Kentucky around 11:00 P.M. on May 18, 2016. Curtis Snell and his girlfriend Jennifer Konkright ("Konkright") went to Muggbees in the early morning hours of May 19, 2016. At some point, Kidwell

1

and Mills encountered Konkright and Snell. They were all familiar with each other because Konkright and Snell had visited Kidwell's apartment once before, which resulted in Snell and Konkright being asked to leave by Kidwell.

Near the end of the evening at Muggbees, Konkright and Kidwell got into an altercation. Snell and other individuals also got involved. Snell testified that he was attempting to intervene, when he was attacked by four members of a motorcycle gang known as "Bad to the Bone." The individuals involved from the motorcycle gang included Mills and his fellow members Robert Smith, Willie Washington and Jonathan Griffin. Bouncers broke up the fight and all parties were thrown out of the establishment.

Kidwell claimed that Snell then approached her in the parking lot. She testified that Snell told her he was going to shoot them and that he knew where she lived. Konkright and Snell then got into their vehicle and left. Kidwell and Mills then left in another vehicle and were followed by Mills' fellow motorcycle gang members in a separate vehicle. Throughout the night, Konkright sent multiple angry and threatening messages to Kidwell via Facebook Messenger.

Because of Snell's earlier threats, Kidwell, Mills, and the other vehicle proceeded to Kidwell's apartment in Park Hills. Kidwell's son and mother were at her apartment and Kidwell wanted to make sure they were ok. Kidwell and Mills parked at the foot of the hill near Kidwell's apartment. Kidwell and Mills eventually saw Konkright's vehicle, with Snell in the passenger seat, turn onto Kidwell's street. Kidwell turned her vehicle around and followed Konkright up the hill. Konkright's vehicle began to turn around once it reached Kidwell's apartment. Seeing that Konkright was turning around, Kidwell and the motorcycle gang turned their vehicles around in front of Konkright's vehicle

2

and then turned right onto Dixie Highway. Konkright's vehicle followed as Kidwell was attempting to locate a police officer who often sat in a nearby parking lot late at night. On this particular night the officer was not there, and while Kidwell drove on Dixie Highway Konkright's vehicle pulled alongside Kidwell's.

Within seconds, Kidwell and Mills saw the barrel of a gun emerge from the passenger side window of Konkright's vehicle. Shots were then fired at Kidwell's vehicle and at the motorcycle gang member's vehicle. Kidwell testified she saw a flash, heard glass break, and felt her car shift. She also testified that she felt her insides shift, and soon after realized she had been shot. Kidwell was hit in the thigh and abdomen and stopped her vehicle in the middle of the road. The vehicle with the motorcycle gang members sped off and struck a curb further down the block, but no one in that vehicle was injured.

Police officers responded to the scene and Kidwell was taken to the hospital. Officers then interviewed the motorcycle gang members. Not all of them were able to identify the shooter but several of them indicated it was the person with whom they had gotten into a fight earlier at Muggbees.

Park Hills officer Lieutenant Richard Webster (Lt. Webster) investigated the shooting and interviewed Kidwell and Mills. Both Kidwell and Mills were unsure of Snell's full name, but they did know him as "Gucci Black," "Black," or "Curtis" and that he was from Mississippi. Kidwell claimed she was "one million percent" sure that it was the same person from the bar.

Lt. Webster was able to locate the person whom he believed to be the defendant through Facebook and confirm that he was involved in the bar altercation through surveillance footage from Muggbees bar. Webster showed

3

Kidwell Snell's mugshot pulled from the Kenton County jail's website, and she confirmed that was the person who shot her. Separately, Webster showed the same photo to Mills who also confirmed that was the individual from the fight that evening and who shot Kidwell.

Konkright was then contacted through Facebook by a police detective asking her to help in apprehending and prosecuting Snell. After receiving the message Konkright turned herself in and assisted police in locating and apprehending Snell. Snell was subsequently located in Cincinnati, Ohio and arrested.

Konkright testified against Snell at trial in exchange for a lesser sentence. Konright testified that after they left Mugbees she drove Snell to Covington, where he changed clothes and obtained a firearm. She further testified that Snell came up with an alibi to deny involvement in the shooting, and that she and Snell discussed taking a trip to Mississippi following the shooting. According to Konkright's testimony, the plan was for her to take responsibility for the shooting and claim that she had dropped Snell off before the shooting. The Commonwealth introduced evidence of jail phone calls and letters, believed to be from Snell, which discussed this plan and the case against Snell.

After a three day trial, Snell was convicted of all charges. This appeal followed.

## B. MISSING EVIDENCE INSTRUCTION NOT WARRANTED

On August 22, 2016, defense counsel filed a "Motion for Discovery and To Review Bond." Specifically, defense counsel requested, "(7) ... All evidence known to the Commonwealth, or which may become known, or which through

4

the exercise of due diligence may be learned from investigating officers[.]" The Commonwealth filed an initial response, four days later, on August 26, 2016. The August 26th discovery response the Commonwealth provided to Snell did not contain a recording of a 911 call or the dispatch log.

On June 2, 2017, in preparation for trial, defense counsel made a request for the audio from the 911 call and dispatch log, noting they were not provided by the Commonwealth in the earlier discovery. On June 14, 2017, thirteen months after the shooting, the Commonwealth provided, via email, the dispatch log from Kenton County emergency management. This email indicated that the Commonwealth requested the audio and call log and they were informed that the 911 recording was no longer available as it was over a year old. On June 30, 2017, the defense moved to dismiss the indictment because the Commonwealth failed to timely turn over the now destroyed 911 audio. The trial court denied the motion to dismiss and reserved the right to rule on the missing evidence instruction at trial. Snell now argues that the trial court erred in failing to give a missing evidence instruction regarding the 911 recording.

A missing evidence instruction is only required when failure to collect or preserve evidence was intentional and the nature of the evidence was apparent.[1] This Court shall review a trial court's denial of a missing evidence instruction for abuse of discretion.[2]

---

[1] *Madden v. Commonwealth*, 582 S.W.3d 54, 69 (Ky. 2019).
[2] *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006).

This Court has held that the standard for a missing evidence instruction is the following:

> First, the purpose of a "missing evidence" instruction is to cure any Due Process violation attributable to the loss or destruction of *exculpatory* evidence by a less onerous remedy than dismissal or the suppression of relevant evidence. Thus, there is no basis for an instruction permitting the jury to infer that missing evidence, if available, would be adverse to the defendant and favorable to the Commonwealth. *See South Carolina v. Katzenbach,* 383 U.S. 301, 323–24, (1966) ... Second, the Due Process Clause is implicated only when the failure to preserve or collect the missing evidence was intentional and the potentially exculpatory nature of the evidence was apparent at the time it was lost or destroyed. None of the above precludes a defendant from exploring, commenting on, or arguing inferences from the Commonwealth's failure to collect or preserve *any* evidence. It just means that absent some degree of "bad faith," the defendant is not entitled to an instruction that the jury may draw an adverse inference from that failure.[3]

Snell asserts that exculpatory information would be found within the 911 recordings. He argues that any evidence identifying the shooter on the 911 call would be material. Kidwell and Mills testified that immediately after the shooting they called 911. The call log notes that the caller knew the shooter. Snell maintains that the call log contained the names of the victims and Konkright's name, however the notes did not identify Snell, instead only that the victims knew the shooter. Snell claims that the identification of Konkright but not him specifically would have been exculpatory as his main defense was that he was not the shooter.

---

[3] *Estep v. Commonwealth,* 64 S.W.3d 805, 810 (Ky. 2002).

6

A missing evidence instruction is required where: 1) the evidence is obviously exculpatory; 2) the exculpatory nature was apparent before it was destroyed; and 3) the destruction was intentional.[4] In the present case there is no evidence to support that the 911 recording was exculpatory, or that the destruction was intentional. The mere fact that the 911 call stated that the victim knew who the shooter was without stating specifically who they were does not establish the call was exculpatory. From the time that Kidwell was shot and throughout the trial she maintained that she knew the individual who shot her, that individual was the same individual from Muggbees earlier that night, and that she knew him as either "Curtis" or "Gucci Black." Kidwell informed Lt. Webster of the information she knew about Snell while in the hospital, and subsequently identified him.

Snell fails to show that the destruction was intentional as the recording was destroyed within normal practices of Kenton County Emergency Management. While Snell asserts that the trial court erred in determining that the Commonwealth did not act in bad faith, he offers no evidence that the Commonwealth intentionally destroyed the 911 recording. Snell asserts that the prosecutor ignored the discovery request and that should be sufficient evidence of misconduct. However, this Court has held that an "attempt to distill bad faith...is utterly speculative and, as we have observed, jury instructions may not reflect merely speculative theories."[5]

---

[4] *Id.*

[5] *McPherson v. Commonwealth*, 360 S.W.3d 207, 218 (Ky. 2012).

7

When the Commonwealth fails to preserve evidence, the defendant must prove bad faith. This Court has held that "negligence simply does not arise to the level of bad faith...."[6] Therefore, we hold that there is no due process violation on the mere failure of the Commonwealth to timely preserve the 911 recording.

Furthermore, Snell contends that even if this Court determines that the recording was not exculpatory we should find that the recording would have provided impeachment material. Snell argues that the 911 call was relevant to impeach the witnesses because it would confirm that one of Kidwell or Mills was lying about calling 911. Snell believes that either Kidwell or Mills was lying about calling 911. Both Kidwell and Mills testified that immediately after the shooting Kidwell stopped the vehicle and called the police. Both Kidwell and Mills testified that they, themselves, were the individual who called 911 and that they stated they knew who the individual was who shot Kidwell.

The absence of a missing evidence instruction does not preclude the defendant from "exploring, commenting on, or arguing inferences from the Commonwealth's failure to collect or preserve *any* evidence. It just means that absent some degree of 'bad faith,' the defendant is not entitled to an instruction that the jury may draw an adverse inference from that failure."[7] In the present case, defense counsel cross-examined Kidwell regarding any 911 call discrepancy, however he chose to not cross-examine Mills about the 911 call. Snell did call Gordon Ramler, of Kenton County emergency communication

---

[6] *Collins v. Commonwealth*, 951 S.W.2d 569, 573 (Ky. 1997).

[7] *Estep*, 64 S.W.3d at 810.

center, who testified that the call log contained incident notes including: 1) "girlfriend shot"; 2) "red Kia"; 3) "victim knows them"; and 4) "female shot in leg." During closing arguments defense counsel made multiple mentions to the jury that they believed Mills and/or Kidwell testified incorrectly to information regarding the 911 call. The jury was able to weigh the credibility of the evidence as a whole and found Snell guilty. We hold the trial court did not err in declining to include a missing evidence instruction.

## C. TRIAL COURT DID NOT ERR IN OVERULING MOTION FOR DIRECTED VERDICT

Snell's second argument is that the trial court erred in not granting a directed verdict on the first-degree assault charge. Snell argues that the Commonwealth's evidence was insufficient to prove that Kidwell suffered a serious physical injury. At the close of the Commonwealth's evidence, defense counsel moved for a directed verdict, and the trial court denied Snell's motion. Defense counsel renewed its motion for a directed verdict at the close of all the evidence, which was again overruled by the trial court. Therefore, the issue is preserved for review.

In *Commonwealth v. Benham*, this Court set the standard for granting or denying directed verdict motions:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony. On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find

9

guilt, only then the defendant is entitled to a directed verdict of acquittal.[8]

We therefore review Snell's claim based on the evidence presented to determine if it is sufficient to persuade a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty of an assault which results in serious physical injury.

Pursuant to Kentucky Revised Statute ("KRS") 508.010, assault in the first-degree requires "serious physical injury" caused either intentionally or wantonly. KRS 500.080(15) defines "serious physical injury" as "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss of impairment of the function of any bodily organ."[9]

Dr. Betty Tseui was the trauma surgeon who treated Kidwell the night she was shot. In Dr. Tseui's deposition testimony, which was played at trial, she noted that the initial surgery revealed a total of six seperate injuries to Kidwell's abdomen, small bowel, and colon. Dr. Tseui further testified that without the surgery Kidwell would have suffered stool leakage from her colon into her abdomen, and it would have created a substantial risk of death.

Snell counters that Kidwell's injuries were not a "serious physical injury" as Kidwell was treated at the hospital for her gunshot wounds and bowel damage, but never faced "substantial risk of death." Snell cites to multiple cases where the Commonwealth failed to establish "serious physical injury." The first case presented a victim who sustained an extensive facial laceration along the

---

[8] 816 S.W.2d 186, 187 (Ky. 1991).
[9] KRS 500.080(15).

10

jaw line caused by a straight razor.[10] However, that particular victim had the laceration sutured and he was sent home the same day, there was no subsequent medical treatment required.[11] In the second case Snell cites a victim that was only shot through the hand.[12] The trial record showed that no medical experts testified and only a small scar was visible when the victim testified.[13] The emergency room records in that case indicated no range of motion limitations or loss of strength, and the victim testified that the injury only required a follow-up to remove the stitches.[14]

It is uncontested that Kidwell's gunshot wound in her abdomen perforated her bowel and that her wounds required surgery. Approximately one month after the initial surgery Kidwell returned to the hospital due to an obstruction in her bowel, which required her to be hospitalized for a week. Kidwell additionally required another five days in the hospital stemming from further obstruction complications.

In *Brown v. Commonwealth,* this Court held that a stab wound resulting in a collapsed lung and pneumothorax was sufficient to establish "serious physical injury."[15] This Court found that the trial testimony established sufficient evidence that if the victim's wounds were left untreated they would be potentially fatal.[16] In the present case, Dr. Tsuei testified that surgery was

---

[10] *Anderson v. Commonwealth,* 352 S.W.3d 577, 582 (Ky. 2011).

[11] *Id.*

[12] *McDaniel v. Commonwealth,* 415 S.W.3d 643, 659 (Ky. 2013).

[13] *Id.*

[14] *Id.*

[15] 553 S.W.3d 826 (Ky. 2018).

[16] *Id.* at 831.

11

required to repair the damage; that if the bullet hole in her colon were not repaired it would result in leakage of stool into Kidwell's abdomen; that if untreated a person would become extremely sick; and, these types of injuries could be fatal if left untreated.

We hold that it was not "clearly unreasonable" for the jury to find that multiple gunshot wounds, specifically the shot causing injuries in the abdomen, were a "serious physical injury."

## D. INSTRUCTION ON LESSER INCLUDED OFFENSE NOT WARRANTED

At trial the defense counsel argued for a second-degree assault instruction on the theory that the jury could not find the evidence sufficient to prove serious physical injury but could have found physical injury. The trial court denied the defense counsel's tendered instruction. Snell now argues that the instruction for the lesser included offense was warranted because the Commonwealth failed to prove "serious physical injury."

A lesser-included offense instruction is required "if, only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense."[17] We therefore must determine whether a reasonable juror could acquit of the greater charge but convict on the lesser.[18] This Court shall review the trial court's denial of a jury instruction as to the lesser-included offense for abuse of discretion.[19]

---

[17] *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky. 1998).

[18] *Thomas v. Commonwealth*, 170 S.W.3d 343 (Ky. 2005).

[19] *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006).

Snell attempts to argue that as in *Swan v. Commonwealth*, the evidence here "fell somewhere in the gray area between mere physical injury and serious physical injury."[20] However, the *Swan* court involved two victims who suffered gun shots to either the leg, thigh, or ankle that mainly resulted in scarring and some minor nerve damage.[21] Neither victim was required to stay more than a day in the hospital due to their underlying gun shot wounds.[22] In *Swan*, this Court held the Commonwealth's evidence was far from persuasive that the victims suffered serious physical injury and the court erred by not providing the lesser included offense instruction.[23]

Snell relies on the argument that not all gunshot wounds cause serious physical injuries.[24] Snell argues that the *Luttrell* court found the trial court erred in not giving a second-degree instruction because Luttrell intended to injure and not kill the victim.[25] Yet, the facts of *Luttrell* are distinguishable as Luttrell shot a police officer in the chest with "bird shot" and the wounds were only superficial.[26]

Here, Kidwell and Dr. Tsuei both testified that the single gunshot to Kidwell's abdomen had punctured her colon and caused multiple internal injuries. Dr. Tsuei testified that leakage from the colon into the body could cause serious complication, extreme sickness, and death if not treated. Kidwell

---

[20] 384 S.W.3d 77, 101 (Ky. 2012).

[21] *Id.* at 99.

[22] *Id.*

[23] *Id.*

[24] *Luttrell v. Commonwealth*, 554 S.W.2d 75, 79 (Ky. 1977).

[25] *Id.* at 77.

[26] *Id.*

13

required surgery to repair her colon and she suffered multiple complications from bowel obstructions because of the gunshot. The injuries suffered by Kidwell were more serious than those within a "gray area." The jury heard testimony from Kidwell and recorded deposition testimony from Dr. Tsuei about the seriousness of Kidwell's injuries. Certainly a reasonable juror could have found the evidence sufficient to determine the gun shot wounds resulted in serious physical injury. We hold that an instruction on the lesser included offense was not warranted.

### E. PHOTO IDENTIFICATION WAS NOT UNDULY SUGGESTIVE

Snell argues that the single mugshot photo used by Lt. Webster for Kidwell and Mills to identify Snell was unduly suggestive. Defense counsel filed a motion to suppress and it was denied by the trial court.

We review a trial judge's ruling on admissibility of evidence for an abuse of discretion.[27] The trial judge abuses their discretion if the decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[28]

The United States Supreme Court has established that there is a two-part analysis used when determining if the due process clause may have been violated by impermissibly suggestive evidence.[29] This two-pronged analysis has been adopted in Kentucky, and the first prong requires this Court to "determine whether the confrontation procedures employed by the police were 'suggestive.'"[30] Then if we determine that the procedure was suggestive, the

---

[27] *Commonwealth v. Parker*, 409 S.W.3d 350, 352 (Ky. 2013).

[28] *King v. Commonwealth*, 142 S.W.3d 645, 649 (Ky. 2004).

[29] *Neil v. Biggers*, 409 U.S. 188 (1972).

[30] *Wilson v. Commonwealth*, 695 S.W.2d 854, 857 (Ky. 1985).

identification may still be admissible "if under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive."[31]

In determining the totality of circumstances *Neil* laid out a five-factor test. The five factors, as applied by *King*, include: "1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation."[32]

This Court has clearly established that the identification of a suspect using a single mug shot photograph without any other photos is unduly suggestive.[33] Here, it is undisputed that Lt. Webster showed only a single mug shot photo of Snell to Kidwell and separately to Mills. However, this was not an identification set up through a confrontation procedure, this was the identification of an individual the victim knew, and knew specifically by first name and nickname. Kidwell knew that the individual who shot her was a person she was familiar with called "Curtis" or "Gucci Black" who was from Mississippi. Kidwell and Mills both encountered Snell earlier that evening at Muggbees bar, and in the parking lot. Kidwell and Mills informed Webster of this fact, and Webster subsequently used a former mug shot to confirm Snell's identity to assist in the

---

[31] *Dillingham v. Commonwealth*, 995 S.W.2d 377, 383 (Ky. 1999) (quoting *Stewart v. Duckworth*, 93 F.3d 262, 265 (7th Cir. 1996), and *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

[32] 142 S.W.3d at 649.

[33] *Moore v. Commonwealth*, 569 S.W.2d 150, 153 (Ky. 1978) (citing *Manson v. Brathwaite*, 432 U.S. 98 (1977)).

15

investigation. This Court has held that it is not improper to use a single photo to confirm a witness's previous identification: "there's certainly nothing wrong with a witness being allowed to reaffirm the accuracy of her previous identification as long as that previous identification has not been impermissibly suggestive or tainted."[34]

Nevertheless, we briefly review whether Kidwell's and Mills' identification of Snell was reliable even though it was suggestive.[35] Kidwell testified that she observed Konkright and Snell get into Konkright's vehicle in Muggbees parking lot. Kidwell testified she witnessed Snell in the passenger seat as Konkright's vehicle passed her heading towards Kidwell's apartment. Kidwell and Mills both testified that the intersection they were driving through when the shooting occurred was well-lit, and they had no issues identifying Konkright and Snell inside the vehicle. Kidwell testified she saw Snell's face as he was shooting at her vehicle.

Second, in assessing the witness's degree of attention we are convinced that Kidwell was specifically looking for Konkright's vehicle. Kidwell testified she was sitting at a stop sign close to her apartment when she witnessed Konkright's vehicle turn onto her street with Snell in the passenger seat.

Third, we assess the accuracy of Kidwell's prior description of Snell. Kidwell testified she knew the shooter from a previous interaction at her apartment that also involved Konkright. Kidwell stated that the individual who shot her was the same individual from the earlier altercation at Muggbees.

---

[34] *Barnes v. Commonwealth*, 410 S.W.3d 584, 587-88 (Ky. 2013).

[35] *Moore*, 569 S.W.2d at 153.

Kidwell also stated that his name was "Curtis," went by "Gucci Black," and he was originally from Mississippi. The accuracy of Kidwell's description is unquestionable.

Fourth, the level of certainty shown by Kidwell was high. She testified that she was certain Snell was the shooter, she maintained from the moment the 911 call was placed until she identified Snell in the courtroom that she knew the individual who shot her.

The final factor requires examining the length of time between the crime and the identification. Here, the shooting occurred around 2:55 A.M. on May 19th, and Lt. Webster interviewed both Kidwell and Mills following the shooting where they identified Snell. Webster returned to the hospital on May 20th and showed Kidwell the mug shot photograph of the man she previously acknowledged was the shooter, which she subsequently confirmed as the individual from the bar and the person who shot her.

Under the five-factor test as applied through *King*, we find the identification of Snell to have been reliable. We agree that a single photo identification can be unduly suggestive, however we hold that in the present case the trial court properly denied the motion to suppress.

## F. <u>SENTENCING PHASE ERRORS DO NOT MEET PALPABLE ERROR STANDARD</u>

Snell claims that he was substantially prejudiced because the Commonwealth presented incorrect or false testimony during the sentencing phase regarding parole eligibility and the application of "good time credits." Snell acknowledges the errors claimed are not preserved for review, therefore he requests we review for palpable error.

17

Pursuant to Kentucky Rule of Criminal Procedure (RCr) 10.26 we proceed to review unpreserved errors on direct appeal for palpable error. RCr 10.26 provides:

> A palpable error which affects the substantial rights of a party may be considered...by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

"The palpable error rule mandates reversal when 'manifest injustice has resulted from the error.'"[36] Snell now requests palpable error review, claiming the inaccurate testimony affected the fairness and integrity of the sentencing phase rendering it "shocking and jurisprudentially intolerable."[37]

During the sentencing phase of the trial, the Commonwealth elicited testimony from Probation and Parole Officer Taleah Jefferson. Officer Jefferson testified that first-degree wanton endangerment, a class D felony, has a penalty range of one to five years. She also testified that first-degree assault, a class B felony, carries a penalty range of 10 to 20 years. She testified that under parole eligibility guidelines Snell would be eligible for parole after serving 15% of his sentence for the wanton endangerment charges, and after serving 85% of the assault charge. She did not make clear that parole eligibility would be 15% only if the aggregate sentence for Snell's entire conviction were one to five years.

Officer Jefferson's testimony was inaccurate because Snell's aggregate sentence was more than five years. Due to persistent felony offender

---

[36] *Murphy v. Commonwealth*, 509 S.W.3d 34, 42 (Ky. 2017) (quoting *Elery v. Commonwealth*, 368 S.W.3d 78, 98 (Ky. 2012)).

[37] *Martin v. Commonwealth*, 2Q7 S.W.3d 1, 4 (Ky. 2006).

18

enhancement, Snell received a 10-year sentence on each of the four wanton endangerment counts. Therefore, Snell would be required to serve 20% of his sentence before being eligible for parole. Officer Jefferson's testimony also resulted in the jury receiving misinformation as to "good time credits" that would be applied to Snell's sentence. Officer Jefferson initially testified that Snell would automatically receive seven days of meritorious good time credit per month. However, a few moments later she had to clarify that Snell would receive good time credit if he behaved. Officer Jefferson's testimony was factually incorrect as meritorious good time credits are only applied if Snell performed exceptional meritorious duties of importance in connection with institutional operations and programs.[38] Pursuant to Kentucky Corrections Policies and Procedures 15.3, inmates are entitled to be considered for meritorious good time credits and granted *at the discretion of the warden*. This distinction is key, as there is no automatic award of good time credits absent bad behavior.

Officer Jefferson's testimony regarding parole eligibility and meritorious good time credits was incorrect. "The use of incorrect, or false, testimony by the prosecution is a violation of due process when the testimony is material."[39] Regardless of good faith or bad faith on the part of the prosecution it is a violation of due process.[40] When the prosecution knows or should have known that testimony is false, we must examine and determine whether "there is any reasonable likelihood that the false testimony could have affected the judgment

---

[38] KRS 197.045.

[39] *Robinson v. Commonwealth*, 181 S.W.3d 30, 38 (Ky. 2005) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

[40] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

of the jury."[41]  The Commonwealth knew or should have known that the KRS 439.340(3)(a) limits 15% parole eligibility to Class D felonies with an aggregate sentence of five years or less. Additionally, the Commonwealth knew or should have known that meritorious good time credits are not automatically applied as was testified to by Jefferson.

The Commonwealth asked the jury to impose a fifty year sentence on the assault conviction and ten years on each of the other four convictions, leaving to the jury to decide whether the ten year sentences should run concurrently or consecutively. The Commonwealth made it clear in its closing argument that it was concerned that Snell not have the opportunity to "ever have access to another gun again." While the jury could have recommended more time, it recommended a total sentence of ninety years, and that the four, ten-year sentences run consecutively. The trial court later reduced this sentence to the statutory maximum of seventy years.

Because these errors are unpreserved, they are only subject to palpable error analysis. To find reversible, palpable error, "an appellate court must consider whether on the whole case there is substantial possibility that the result would have been any different." *Commonwealth v. McIntosh*, 646 S.W.2d 43, 45 (Ky. 1983). Later, in *Ernst v. Commonwealth*,[42] our Court defined palpable error as error so grave, that if uncorrected, it would seriously affect the fairness of the proceedings. Having reviewed the record, the palpable error rule and applicable case law, we cannot hold that the inaccurate testimony of Ms. Johnson created

---

[41] *United States v. Agurs*, 427 U.S. 97, 103 (1976).

[42] 160 S.W.3d 744, 758 (Ky. 2005).

a "substantial possibility that the result would have been any different"[43] or affected the fairness and integrity of the sentencing phase.

## G. CONCLUSION

Finding no reversible error, we affirm the trial court below.

All sitting. Minton, C.J.; Hughes, Lambert, Nickell, VanMeter and Wright, JJ., concur. Keller, J., concurs in result only.

COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Assistant Public Advocate
Department of Public Advocacy

Aaron Reed Baker
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Mark D. Barry
Assistant Attorney General

---

[43] *McIntosh,* 646 S.W.2d at 45.